# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**RANDOLPH D. RADER and GAY S. RADER,**

      **Plaintiffs,**

**v.**　　　　　　　　　　　　　　　　　　　　　　　　**Case No: 6:13-cv-878-Orl-31KRS**

**PETE MERCALDO, BRIAN CAVANAUGH, MICHAEL SZCZEPANSKI and CITY OF MELBOURNE,**

      **Defendants.**

## ORDER

This matter comes before the Court without a hearing on the motions for summary judgment (Doc. 52-54) filed by Defendants Brian Cavanaugh ("Cavanaugh"), Pete Mercaldo ("Mercaldo"), and Michael Szczepanski ("Szczepanski"), respectively, as well as the response (Doc. 62) filed by the Plaintiffs, Randolph Rader and Gay Rader, and the reply (Doc. 69) filed by Cavanaugh, Mercaldo, and Szczepanski (henceforth, the "Individual Defendants").

**I.　　Background[1]**

On the evening of February 13, 2012, Plaintiff Gay Rader contacted the Melbourne Police Department from her home in Oviedo, asking the police to check on her son, Ryan Rader (henceforth, "Rader"). Rader lived in an apartment complex in Melbourne known as The Beach

---

[1] Much of the background information is taken from the "Statement of the Case and Facts" provided in the Individual Defendants' motions for summary judgment. In their response, the Plaintiffs did not dispute any of the facts set forth in that portion of the Individual Defendants' motions.

Club Condominiums (henceforth, the "Beach Club").  Gay Rader told the police that she had been speaking with her son on the phone and that he "was suicidal and potentially armed with a handgun."  (Doc. 31 at 3).  Within a few minutes of this call, members of the Melbourne Police Department, including the Individual Defendants, began arriving at the Beach Club.  At the time, Cavanaugh and Szczepanski were officers with the department, while Mercaldo was a lieutenant.

The Individual Defendants had been given Rader's description and had been informed that he was intoxicated, possibly suicidal and possibly armed with a handgun.  To approach Rader's apartment, the Individual Defendants assembled into a "stack" formation, with Cavanaugh in the lead, followed by Szczepanski and then Mercaldo.[2]  All three Individual Defendants were in uniform.  Cavanaugh was armed with a Colt 9mm submachine gun, Szczepanski was armed with a Bushmaster semi-automatic rifle, and Mercaldo had a Glock pistol.   In the stack formation, with weapons drawn, they walked to the building in which Rader had a third-floor apartment.  As they approached the ground-floor vestibule of that building, they encountered Rader, to their right, approximately 15 to 20 feet away.  Rader was holding a beer bottle in his right hand.  (Doc. 31 at 4).

The Individual Defendants recognized Rader based on the description they had been provided and they began shouting commands at him, including a command to "Show me your hands."  (Doc. 31at 4).  Rader put his left hand into his pants pocket and pulled out a handgun.[3]  Some officers shouted for Rader to drop his weapon, but Rader did not do so.  The Individual

---

[2] It appears from the record that at least two other officers joined the Individual Defendants in the "stack" formation but never fired their weapons.  (Doc. 53 at 3).

[3] Cavanaugh testified at his deposition that he opened fire before the pistol was fully withdrawn from Ryan Rader's pocket.  (Cavanaugh Depo. at 43-44).

Defendants opened fire on Rader, who was killed.[4]   According to the Individual Defendants, the entire encounter with Rader lasted a few seconds before he was shot.

Gay Rader and her husband, Randolph Rader, assert claims under 42 U.S.C. § 1983 as representatives of their son's estate against the City of Melbourne (Count I) and the Individual Defendants (Count II).   In addition, both on their own behalf and as representatives of their son's estate, they assert wrongful death claims under Florida law against the Individual Defendants (Count III) and the City of Melbourne (Count IV).   By way of the instant motion, the Individual Defendants seek summary judgment on the grounds of qualified immunity as to the Section 1983 claims and on the grounds of statutory immunity as to the Florida law claims.

**II.      Standards**

    **A.      Summary Judgment**

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact.   Fed.R.Civ.P. 56(c).   Which facts are material depends on the substantive law applicable to the case.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists.   *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and

---

[4] It is not clear from the record how many shots were fired, but it appears to be upwards of 15.

citation omitted). Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

### B. 42 U.S.C. § 1983 and Qualified Immunity

Section 1983 enables a citizen to sue any person acting under color of state law who violates his or her federal constitutional rights. See *Collins v. City of Harker Heights, Tex.,* 503 U.S. 115, 120, 112 S.Ct. 1061, 1066, 117 L.Ed.2d 261 (1992). Qualified immunity protects government officials performing discretionary functions from individual liability under Section 1983 as long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Qualified immunity is an immunity from suit rather than a mere defense to liability, and it is effectively lost if a case is erroneously permitted to go to trial. *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). Unless the plaintiff's allegations state a claim of violation of a clearly established constitutional right, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery. *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001). Even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in question in fact committed those acts. *Mitchell*, 472 U.S. at 526, 105 S.Ct. at 2815.

To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority.  *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003).  Once the defendants establish this, the burden shifts to the plaintiffs to show that qualified immunity is not appropriate.  *Id.*   The Supreme Court has established a two-part test to determine whether qualified immunity should apply.   The court must determine whether plaintiff's allegations, if true, establish a constitutional violation."  *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S.Ct. 2508, 2514, 153 L.Ed.2d 666 (2002).   This requires the court to determine whether the facts alleged, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right.  *Gonzalez*, 325 F.3d at 1234.   The second prong of the test requires the court to determine whether the right was "clearly established."  *Id*.   Although it will often be appropriate to consider whether a constitutional violation has been alleged before assessing whether the right at issue is clearly established, the two determinations may be made in either order.  *Pearson v. Callahan*, 555 U.S. 223, —, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009).

  **C.** **Excessive Force**

The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest.  *See, e.g., Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (citing *Graham v. Connor*, 490 U.S. 386, 394–95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).   The Fourth Amendment's "objective reasonableness" standard supplies the test to determine whether the use of force was excessive.  *Penley v. Eslinger*, 605 F.3d 843, 849-50 (11th Cir. 2010).   Accordingly, the court must carefully balance the nature and quality of the intrusion on the individual's Fourth Amendment interests

against the countervailing governmental interests at stake.  *Id.* at 850 (citing *Graham*, 490 U.S. at 396, 109 S.Ct. at 1871).

> The analysis requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [the suspect] … actively resist[ed] arrest or attempt[ed] to evade arrest by flight.

*Id.*

To determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand.  *Lee*, 284 F.3d at 1197.  "Use of force must be judged on a case-by-case basis 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir.1993) (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865), *modified*, 14 F.3d 583 (11th Cir.1994).

**III.    Analysis**

    **A.    Qualified Immunity**

It is undisputed that the Individual Defendants were acting within the scope of their discretionary authority when the conduct at issue occurred.  Accordingly, the burden shifts to the Plaintiffs to show that qualified immunity is not appropriate.  *Lee*, 284 F.3d at 1194.

At the time Rader was killed, the Melbourne Police Department had a Crisis Negotiation Unit (henceforth, the "CNU"), with officers trained to respond to situations involving suicidal and/or substance-impaired persons.  The department also had a policy, entitled "Handling Mentally and Substance Impaired Persons" (henceforth, the "Impaired Persons Policy"), which provided in pertinent part:

> 41.14.7:  Persons who are mentally ill or in an emotional crisis are very sensitive and often very frightened by what is happening to them.  Employees' first objective is to try to calm the situation.

> Communication should be a basic tool for intervention.   If in contact by telephone:
>
> 1.  Introduce yourself and other officers;
>
> 2.  Establish a helping tone with both the person and others at the scene;
>
> 3.  Ask open-ended questions to allow the person to explain the problems;
>
> 4.  Reassure the caller that you are sending someone to help.
>
> 41.14.8:   Upon arrival at the scene or during custodial or non-custodial interview, the Officer:
>
> 1.  Introduce yourself and other officers;
>
> 2.  State the reason for your presence;
>
> 3.  Establish a helping tone with both the person and others at the scene;
>
> 4.  Ask open-ended questions to allow the person to explain the problems;
>
> 5.  Make yourself appear less threatening by sitting/standing on the person's level, unless officer safety would be affected.

Much of the Plaintiffs' response revolves around the CNU and the Impaired Persons Policy and, more particularly, the failure to call in the former or to follow the latter:

> Ryan Rader's Fourth Amendment rights were violated when Lt. Mercaldo, along with Officers Cavanaugh and Szczepanski failed to have a meeting, discuss strategy for dealing with Ryan Rader and failed to use any of the techniques outlined in the [Impaired Persons Policy] such as communicating with Ryan Rader … on his cell phone.   Lt. Mercaldo, as watch commander, had the ability to call in the Crisis Negotiation Unit but failed to do that.   There was no urgency, no reason to rush, as Mr. Rader was not posing a threat to anybody. . . . The officers' task should have been to communicate and calmly convince Mr. Rader to surrender for medical treatment.

(Doc. 62 at 3-4).

It is true that a different approach, such as calling Rader rather than attempting to contact him in person, might have averted this tragedy.    It is also possible that doing so might have resulted in more people being hurt.    It is impossible to know.    Either way, however, the question before the Court is not whether a different course of action might have produced a better outcome, but whether the course of action taken by the Defendants violated Rader's constitutional rights.

The Plaintiffs suggest that such a violation occurred well before the Individual Defendants encountered Rader -- when they opted not to call him or to bring in the CNU.    Obviously, however, at that point, no seizure had occurred.    Moreover, there is no evidence that, before encountering Rader, the police had decided to seize him or to employ deadly force against him.  The Plaintiffs have not cited any case law (and the Court is not aware of any) holding that a person's Fourth Amendment rights are implicated in such a situation, or, more precisely, that the Constitution requires police officers facing similar circumstances to attempt a phone call or employ crisis negotiators rather than knock on the door.

The proper point of inquiry is that moment when the Individual Defendants opted to employ deadly force – *i.e.*, that moment when, in response to demands that he show his hands, Rader instead pulled a handgun out of his pocket.    The Plaintiffs argue that, because at least some officers also told Rader to drop his weapon, he may have been pulling the gun out to drop it, rather than to threaten the police.    However, none of the Individual Defendants testified that they knew about the gun in Rader's pocket until he began pulling it, and there is no evidence that anyone told Rader to drop the weapon before he reached into his pants pocket.    More to the point, the question is not so much what Rader intended to do with the weapon as what a reasonable officer would have believed Rader intended to do with the weapon.

The Plaintiffs attempt to compare the situation facing the Individual Defendants here with that of *Mercado v. City Orlando*, 407 F.3d 1152 (11th Cir. 2005), an excessive force case in which the Court found the police were not entitled to summary judgment on qualified immunity grounds. However, the situations are not comparable.  In *Mercado*, the plaintiff had threatened to commit suicide after an argument with his wife.  *Id.* at 1154.  He tied a cord around his neck and grasped a knife with both hands while pointing it toward his heart.  *Id.*  Responding to a call from the plaintiff's wife, the police ordered the plaintiff to drop the knife, at least twice.  After he failed to do so, the police employed deadly force to subdue him, resulting in a fractured skull and other injuries.  *Id.* at 1155.  On appeal, the United States Court of Appeals for the Eleventh Circuit reversed the district court's grant of summary judgment in favor of the officer employing the deadly force:

> However, viewing the facts in the light most favorable to Mercado, we can find no evidence that he made any threatening moves toward the police. . . . Furthermore, Mercado was not actively resisting arrest, and there is no evidence that he struggled with the police.

*Id.* at 1157.

In the instant case, though he did not resist arrest or struggle with the police, the evidence is undisputed that Rader made a threatening move toward them; when ordered to show his hands, he instead drew a gun.  Even if, as the Plaintiffs theorize, Rader drew the gun solely for the purpose of dropping it, the situation facing the Individual Defendants did not resemble that facing the officers in *Mercado*, where the knife-wielding plaintiff threatened only himself.

After weighing the relevant factors, the Court concludes that a reasonable officer would have concluded that Rader posed a dangerous risk and that the use of deadly force was justified. Where an officer has probable cause to believe that a suspect poses a threat of serious physical harm, either to the officer or others, use of deadly force does not violate the Constitution.  *Penley*,

605 F.3d at 851 (citing *Graham*, 471 U.S. at 11, 105 S.Ct. at 1701). Accordingly, the Individual Defendants did not violate Rader's constitutional rights and are therefore entitled to qualified immunity.

### B. Statutory Immunity

Under Florida law, an officer may not be held personally liable for any injury resulting from an act committed in the scope of his or her employment unless the officer acted with bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. Fla. Stat. § 768.28(9). The Individual Defendants contend that this statute shields them from liability as to the Plaintiffs' state law wrongful death claims. In response, the Plaintiffs cite to *Moore v. State*, 861 So.2d 1251 (Fla. 5th DCA 2003). However, *Moore* did not involve claims against individuals or an assertion of immunity pursuant to Section 768.28. *Moore* does not aid the Plaintiffs' case. The Plaintiffs also argue that the Individual Defendants are not entitled to immunity under Florida Statute §776.012(1). However, this is not the statute the Individual Defendants cite as the basis for their immunity. The Plaintiffs make no argument as to the Individual Defendants' entitlement to immunity pursuant to Fla. Stat. §768.28(9). Accordingly, the Court finds that the Individual Defendants are entitled to summary judgment on this issue.

### IV. Conclusion

In consideration of the foregoing, it is hereby

**ORDERED** that the motions for summary judgment (Doc. 52-54) filed by Defendants Brian Cavanaugh, Pete Mercaldo, and Michael Szczepanski, respectively, are **GRANTED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on December 9, 2014.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party